**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: August 27 2007**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 05-30554 |
| | ) | |
| Eugene Aaron Majni, | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 05-3141 |
| | ) | |
| Michelle Loddo, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Eugene Aaron Majni, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on Plaintiff's complaint to determine the dischargeability of a marital debt. In her complaint, Plaintiff requests that the court declare a debt owed to her by Defendant/Debtor Eugene Aaron Majni, her ex-husband, to be nondischargeable in his Chapter 7 case under 11 U.S.C. § 523(a)(15). The court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and the general order of reference entered in this district. Proceedings to

determine the dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I).

This Memorandum of Decision constitutes the court's findings of fact and conclusions of law under Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052. Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that the marital debt at issue owed by Defendant to Plaintiff pursuant to their divorce decree is nondischargeable.

## FINDINGS OF FACT

### I. The Marital Debt

Plaintiff and Defendant were married in February 1995. On June 5, 2002, the parties entered into a separation agreement and, on October 7, 2002, the Court of Common Pleas of Ottawa County, Ohio, entered a Consent Judgment Entry for Dissolution of Marriage ("consent judgment"). [Plf. Ex. 1]. Pursuant to the consent judgment memorializing the parties' agreement, Defendant was responsible for paying a debt owed to National City Credit for a line of credit secured by Plaintiff's home, as well as a debt owed to First Merit Bank for a loan secured by a World Cat boat that was used by Defendant as a charter fishing boat and a debt owed to Chase Mastercard. The consent judgment required Plaintiff to pay the first mortgage debt on the parties' home, a loan owed to Bank One, and debts owed for the purchase of her Jeep Wrangler vehicle and a Ranger Bass boat. The consent judgment further provides that neither party "shall hereinafter incur any debts or obligations upon the credit of the other and that each of them shall indemnify and hold the other absolutely harmless from any debt or obligation so charged or otherwise incurred." [Pl. Ex. 1, p. 3]. The parties have no children, and there is no support obligation as to either party under the consent judgment.

There was extensive testimony at trial about the World Cat boat and the debt owed on it to First Merit Bank. However, for reasons explained below, that debt is not at issue in this case. The only debt at issue in this case is the debt owed to National City Credit for the line of credit secured by Plaintiff's home. At the time of the divorce, the balance owed on the line of credit was approximately $16,000. However, in 2003, Defendant borrowed an additional $5,500 against the line of credit. Plaintiff did not learn that Defendant had incurred this additional debt until over a year later. Although Defendant was making monthly payments of $200 on the line of credit for awhile, at the time of trial, no payments had been made

2

since August 2005. As of April 2006, the balance owed on that debt was approximately $20,900, and the minimum required monthly payment was $77. Plaintiff testified that at the time of trial she also had not made any payments to National City on the line of credit.

## II. The Parties' Respective Financial Conditions

Defendant is single and lives with his girlfriend and her three children in a home that he rents from his parents. While married, the parties started and operated two businesses - an advertising agency that Plaintiff retained and now operates and a charter boat/fishing guide business retained by Defendant. Although Defendant no longer owns the World Cat boat that he used as his own charter boat, he has continued his business as a Lake Erie fishing guide licensed by the State of Ohio. He generally runs charters arranged by other boat owners; however, he also leases boats for charters that he arranges himself. Because the charter boat business is seasonal, running from May through October, Defendant has also worked at other jobs since the dissolution, including employment as a mortgage broker and as a speaker at fishing seminars. Defendant testified that he is no longer employed as a fishing seminar speaker because the demand for such seminars was insufficient to warrant his employment and he allowed his mortgage broker's license to become inactive because, given the market, the ability to do well as a mortgage broker has greatly diminished since 2003. In March 2006, Defendant began working for RV Haulers of Ohio towing vehicles across the country. But when fishing season began in mid-May 2006, he returned to working full time at his fishing guide business. Defendant testified that he is "at his optimum" working in his fishing guide business–a business that he admits he loves even though it "may not make a lot of money"-- but still plans on working for RV Haulers of Ohio during the off season. Defendant's 2005 federal income tax return showed Adjusted Gross Income of $3,917, including business income of just $330 and W-2 wages from the mortgage business of $3,587. The return presented to the court and admitted as evidence is missing the first page of Schedule C, which would show his gross revenue. Defendant's financial situation entitled him to claim the earned income credit in the amount of $300 for 2005.

Defendant itemized his current income and expenses based on the twelve month period before trial, from August 2005 to August 2006, in the form of Bankruptcy Schedules I and J. [Def. Ex. B]. His trial exhibit Schedule I shows average gross monthly income in the amount of $723. The court finds that this amount is understated. At trial, Defendant testified that during the peak fishing season of May, June and July, he often works seven days per week and earns $150 per day plus tips when he runs charters arranged by other boat owners and approximately $200 per day, plus tips and after expenses, when he arranges the

3

charter himself.[1] By August 31, 2006, the date of trial, Defendant had run 74 charters for others and 13 of his own charters and had grossed $16,950 exclusive of tips for the 2006 season. If that number alone is divided by 12, Defendant's average gross monthly income for the twelve months preceding trial would thus have been $1,412.

Defendant further testified that he hoped to run a total of 100 to 115 charters by the end of the season in October 2006. Thus, with the additional trips, Defendant's reasonably projected gross income in 2006 from his fishing guide business alone is approximately $19,000, based on an additional 13 charters operated for others at $150 per charter, for an additional $2,250 added to the $16,950 generated up to trial.

As to his future income, Defendant also testified that he intends to resume carrying loads for RV Haulers of Ohio during the off season, where he grossed $120 to $160 per day when carrying a load from March through mid-May 2006. Based on his experience with that company in Spring 2006, he anticipates that he will return to RV Haulers of Ohio in the 2006-2007 off season. Assuming Defendant averages just one three day hauling trip per week at $150 per day during 25 out of the 27 weeks in the off season period from November 2006 thought April 2007, he will gross approximately an additional $11,250.

In projecting Defendant's income as required to decide this case, the court finds that Defendant's business and employment experiences in the spring and summer of 2006 are relevant and the most reasonably predictive of future income. Both the operation of Defendant's fishing guide business and his off-season employment have changed materially from 2005 and earlier years. Thus, Defendant's total anticipated income for the 12 months from May 2006 through April 2007 is approximately $30,000, or an average gross monthly income of $2,500, exclusive of tips.

Defendant's Schedule J admitted as an exhibit at trial shows total average monthly expenses of $2,907 for the twelve months preceding trial. Of this $2,907 total, $1,037 is attributed to average monthly business expenses, set out in detail on an attachment to and incorporated in Schedule J, and $1,870 is attributable to average monthly personal expenses. However, this total figure is overstated. Defendant's business expenses of $1,037 include a telephone expense of $184. Defendant testified that he has only one home telephone and one cell phone, the expenses for which are also separately set forth on Schedule J and that the $184 expense was erroneously included in his business expenses. In addition, Defendant testified that he pays the cablevision, telephone and cell phone expenses and that his girlfriend pays the other utility bills. Nevertheless, his Schedule J lists expenses for all of the household utilities, which totals

---

[1] Defendant testified that he has no expenses (i.e. gas, bait, ice) directly related to charters run for other boat owners but does incur such expenses together with the expense of leasing a boat when he arranges the charter himself.

4

approximately $200 more than what he actually pays.[2] The court also finds that Defendant's trial exhibit Schedule J double counts a $200 monthly vehicle expense as both a personal expense on Line 13a of Schedule J and as a business expense on Line 14 of his attached Business Income and Expense document. At filing, Defendant had no expenses on either line. [Case No. 05-30554, Doc. ## 1 [Schedule J] and 15]. Defendant testified that he had to incur new debt on his truck to upgrade it for hauling, and that the payments are $200 per month. The court finds that this $200 is the monthly vehicle expense on the trial exhibit, but that it can only be counted once. Defendant also includes a monthly home maintenance expense of $100. The court finds this expense unreasonable in light of the fact that he rents the home from his parents. With these total adjustments of $684 to Defendant's average monthly expenses, he has projected monthly gross income ($2,500) after expenses ($2,223) for the period of May 2006 through April 2007 of approximately $277 before considering tips.

Plaintiff also testified and provided her 2005 income tax return and a list of her income and expenses in the form of Schedules I and J for the twelve months preceding trial. [Pl. Exs. 3 & 4]. As her income and business experiences are not in flux, this is a time period reasonably predictive of her future financial situation. Plaintiff's net income from her advertising business for 2005 was $8,935. Defendant acknowledged that this is still essentially a start-up business and that based on his experience with the business, Plaintiff's reported income is reasonable. Plaintiff's Schedule I shows gross monthly income of $7,618. Plaintiff's Schedule J shows total monthly expenses of $11,862, which amount includes business expenses of $7,133, and personal expenses of $4,729, including a $440 mortgage payment, a car payment of $237, and other monthly loan and credit card payments totaling $1,848.

Plaintiff's monthly loan payments include a $650 payment on the loan secured by the World Cat boat. Although Defendant was awarded the World Cat boat and was responsible for the payments on that loan under the consent judgment, he was not current on his payments. In order to avoid seizure and a forced sale of the boat by First Merit and damage to Plaintiff's credit, Defendant signed the boat over to Plaintiff and Plaintiff voluntarily took over from Defendant the payments on the boat. For this reason, the approximately $19,000 in marital debt relating to the World Cat boat is not at issue in this adversary proceeding. Plaintiff incurred additional debt of approximately $11,000 [Plf. Ex. 4, p. 5] to make the back payments owed to First Merit that Defendant had not made plus for expenses to repair the boat so that it

---

[2] When asked if he actually paid all of the expenses listed on Schedule J, Defendant later testified that the expenses "looked right." The court does not credit this testimony as it is inconsistent with his earlier testimony regarding expenses that his girlfriend pays.

5

could be sold other than at a forced liquidation sale. She has been trying, without success, to sell the boat through a broker for more than a year. Plaintiff testified that she must sell the boat for $45,000 in order to break even on her obligations, the brokerage fee and docking and storage fees, and that the fair market value of the boat is approximately $47,900. There have been no offers at that price. Although Plaintiff's monthly business and personal expenses are far in excess of net her income from her advertising agency,[3] the record is silent regarding any additional income that Plaintiff might receive or assets she might have to cover these expenses. Plaintiff testified that she uses "a lot of credit cards" to pay her debts.

## LAW AND ANALYSIS

Plaintiff contends that Defendant's obligation under the divorce decree to pay the debt owed to National City Credit is nondischargeable under § 523(a)(15).[4] That section provides that an individual is not discharged from any debt

> not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless–
>
> > (A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor. . .; or
> >
> > (B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

11 U.S.C. § 523(A)(15). This section "is intended to cover divorce-related debts such as those found in property settlement agreements that 'should not justifiably be discharged.'" *In re Crosswhite*, 148 F.3d 879, 882 (7th Cir. 1998) (citing Collier on Bankruptcy ¶ 523.21 (Lawrence P. King et al. eds.)). The burden of proving that the debt is of a type excepted from discharge under § 523(a)(15) rests with the objecting creditor/spouse. *Hart v. Molino (In re Molino)*, 225 B.R. 904, 907 (B.A.P. 6th Cir. 1998). Once this burden

---

[3] Line 20c on Plaintiff's Schedule J is filled out incorrectly and does not make sense. Instead of $7,133 on Line 20b, which represents only Plaintiff's average monthly business expenses, the correct number is $11,862 from Line 18, which includes both the average monthly business expenses of $7,133 and her average monthly personal expenses of $4,729. The correct number on Line 20c should be negative $4,249. Even if the monthly payments of $972 relating to the World Cat boat are removed from the analysis, Plaintiff would still show average monthly expenses exceeding average monthly income by $3,277.

[4] Section 523(a)(15) was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA" or "the Act"), effective October 17, 2005. Because Plaintiff's bankruptcy case was filed before the effective date of the Act, all references to the Bankruptcy Code in this opinion are to the pre-BAPCPA version of the Code. *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, sec. 1501(b)(1), Pub. L. No. 109-8, 119 Stat. 23, 216 (stating that, unless otherwise provided, the amendments do not apply to cases commenced under Title 11 before the effective date of the Act).

6

is met, the burden shifts to the debtor to prove either of the exceptions to nondischargeability set forth in subsections (A) or (B). *Id.* at 907, 909. Defendant must make his showing by a preponderance of the evidence. *Grogan v. Garner*, 488 U.S. 279, 291 (1991). As subsections (A) and (B) of § 523(a)(15) are in the disjunctive, he need not prove both to prevail. *Molino,* 225 B.R. at 907*; Baker v. Baker (In re Baker),* 274 B.R. 176, 197 (Bankr. D.S.C. 2000).

The parties do not dispute that the marital debt at issue arose in connection with the consent judgment dissolving their marriage and, in fact, the consent judgment clearly sets forth Defendant's obligation to pay both the debt owed to National City Credit at the time of their dissolution and the additional debt owed to National City Credit that was incurred by him without Plaintiff's knowledge after the dissolution. Plaintiff's burden of proof is satisfied, and it is incumbent upon Defendant to establish either an inability to pay the debt or that a discharge would result in a benefit to him that outweighs the detriment to Plaintiff.

## I. 11 U.S.C. § 523(a)(15)(A) - Ability to Pay Test

The starting point under § 523(a)(15)(A) for the determination of ability to pay is at the time of trial, and a debtor's future circumstances and earning potential may be considered. *Jestice v. Jestice (In re Jestice)*, Case No. 05-3007, 168 Fed. Appx. 39, 2006 U.S. App. LEXIS 6863 at *13 (6th Cir., Feb. 9, 2006); *Molino*, 225 B.R. at 908. In determining a debtor-spouse's ability to pay a marital debt, a majority of courts utilize the disposable income test under § 1325(b)(2). *Id.; see, e.g.*, *Hammermeister v. Hammermeister (In re Hammermeister),* 270 B.R. 863, 874-75 (Bankr. S.D. Ohio 2001); *Gamble v. Gamble (In re Gamble),* 143 F.3d 223, 226 (5th Cir. 1998)("[B]ankruptcy court was correct to focus its investigation on whether Mr. Gamble could make reasonable payments on the debt from his disposable income."). In this court's view, care needs to be taken in doing so. The text of § 523(a)(15)(A) establishes a four part inquiry to be undertaken by the bankruptcy court. The court must determine: (1) the debtor's income; (2) the debtor's property; (3) the expenses reasonably necessary for the maintenance or support of the debtor or any dependent of the debtor; and (4) after payment of such reasonably necessary expenses, whether debtor can pay the marital debt from income or property within a reasonable amount of time. *See Sacher v. Gengler (In re Gengler)*, 278 B.R. 146, 150 (Bankr. N.D. Ohio 2002); *Findley v. Findley (In re Findley)*, 245 B.R. 526, 529 (Bankr. N.D. Ohio 2000). While there is some logic to looking at the disposable income test under § 1325(b) and related case law in considering the factors set forth in § 523(a)(15), the introductory language to the definition in § 1325(b)(2) states that "disposable income" is being defined "[f]or purposes of this subsection." There are also significant differences between the language of the two provisions that

7

get washed out by wholesale transfer of the Chapter 13 definition of "disposable income" into § 523(a)(15)(A). *See Straub v. Straub (In re Straub)*, 192 B.R. 522, 528 (Bankr. D.N.D. 1996). Congress chose not to use the word "disposable" in § 523(a)(15)(A) or to incorporate that definition into its terms. Moreover, Congress' definition of disposable income under § 1325(b)(2) expressly includes charitable contributions up to a prescribed limit as reasonably necessary expenses. Section 523(a)(15)(A) does not.

On the other hand, there are unquestionably aspects of the manner in which courts interpret the "disposable income" test of § 1325(b) that are analytically valid in the statutory inquiry under § 523(a)(15)(A). For example, in applying the disposable income test of § 1325(b), courts generally analyze a debtor's average income and expenses on a monthly basis using Bankruptcy Schedules I and J. This is an equally valid and helpful approach to determining under § 523(a)(15)(A) whether or not a debtor has the ability to pay a marital debt. Except as to the explicit definitional difference involving charitable contributions, the determination of what kinds of expenses and in what amounts are reasonably necessary for support of a debtor or a debtor's dependents should logically be the same under both sections of the statute. In deciding whether Defendant has the ability to pay the marital debt at issue, this court will therefore be guided by the plain terms of § 523(a)(15)(A), looking to other sections of the Bankruptcy Code to the extent such guidance does not conflict with or change the plain meaning of the Code section in issue. "Statutory context can suggest the natural reading of a provision that in isolation might yield contestable interpretations." *Price v. Del. State Police Fed. Credit Union (In re Price)*, 370 F.3d 362, 369 (3d Cir. 2004)(citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) and *Kelly v. Robinson*, 429 U.S. 36, 43 (1986)).

The evidence at trial includes Defendant's 2005 federal income tax return, showing only $3,917 in net income plus the earned income credit payment of $300 to which he was entitled. [Def. Ex. A]. The court wholly discounts this evidence as persuasive in determining whether Defendant has proven that he lacks the ability to pay the National City debt out of future disposable income. First, as Defendant himself acknowledged and the court finds, "this year and last year are quite different." In 2005 he leased a boat and ran more of his own his charters. In 2006 he mostly captained charters for others, which means less gross revenue but also much less expense. Second, the first page of Schedule C showing gross receipts is missing, which obviously impacts the completeness of the document and thus its persuasiveness. Third, some of Defendant's income and expenses for 2005 arose from working as a mortgage broker, which he ceased doing in 2005. By 2006, as he intends to do in the future as well, he was supplementing his guide business income with hauling trailers, which is a very different enterprise than he has engaged in before. Fourth,

8

continued income at the 2005 level would mean that Defendant was clearly and unreasonably underemployed, as Plaintiff argued at trial. While the guide business is what he personally thrives on, at $330 net for the year [Def. Ex. A, Line 12], Defendant would be better off, and certainly capable of, working a $10 an hour retail job and of necessity abandoning the business he loves. Defendant has a high school education, and demonstrated at trial that he is articulate, personable, straightforward, and entrepreneurial, capabilities that undoubtedly make a him good fishing guide but that also demonstrate earning potential well beyond $3,917 per year and even minimum wage. While his ability to earn income has been impacted in the past by his girlfriend's serious illness and his role as her caretaker, he did not report any personal health issues, and he has no dependents. Defendants have an obligation under § 523(a)(15) to maximize their income. *Molino*, 225 B.R. at 908; *Biederman v. Stoodt (In re Stoodt)*, 302 B.R. 549, 556-57 (Bankr. N. D. Ohio 2003). If Defendant insists that a business income of net $330 from the fishing business is the best he can do for six months of the year, then he is clearly not maximizing his income as he is required to do as part of proving the inability to pay under § 523(a)(15).

As explained above, based on the relevant time period between May 2006 and April 2007, Defendant's projected average monthly income and expenses, as adjusted from the admitted Schedules I and J to take into account his testimony at trial, will leave him with average disposable income of approximately $277 per month. *Id.* at 556 ("court must take steps to ensure that debtor's enumerated income and expenses are reasonable, and then to make changes where appropriate."). This figure does not, however, take into consideration any tax liability. Also, in determining whether a Defendant has a sufficient amount of disposable/discretionary income available to pay the marital debt within a reasonable amount of time, courts have warned against dedicating all of such income to repayment of the debt since unexpected expenses, such as car repairs, may arise. *See Koenig v. Koenig (In re Koenig)*, 265 B.R. 772, 775-76 (Bankr. N.D. Ohio 2001). This is perhaps particularly so where a debtor's financial circumstances are in flux, as Defendant's are. He testified, for example, that his 1995 Dodge Ram truck broke down on a hauling trip, resulting in significant expense for fixing the transmission. Thus, Debtor's reasonably anticipated quantified income is essentially breaking even with his stated expenses as adjusted by the court.

Significantly, however, this analysis excludes tips "which he did not report;" it is not clear whether Defendant meant they were not reported on his tax returns or on his Schedule I for the twelve months preceding trial.[5] As a guide, tips are clearly a material part of his income. Defendant testified that he could not tell what tips he had earned for the 2006 season through trial, but that they ranged from nothing to $150

---

[5] There are no tips reported on Line 7 of Defendant's 2005 federal income tax return.

9

per trip and were usually in the $20 to $50 range whether he ran his own trips or captained for other charter services. At the conservatively estimated tip rate of $25 per trip for 100 trips during the 2006 fishing season, the court infers that Defendant's average seasonal tip income would be $2,500. As the party bearing the burden of proving that he cannot pay the marital debt in issue, the absence of an accounting for his earnings from tips contrary to the reasonable inference from his testimony is a significant and determinative omission that must weigh against him instead of against Plaintiff.

Defendant's marital debt totals approximately $20,900 as of April 2006, which amount represents the total owed to National City Credit under the home equity line of credit. The record is silent as to the terms of the loan; however, the minimum payment on the line of credit was $77 in April 2006, which the court assumes represents an interest only payment. Using the tip income alone, Defendant should be able to make on average the minimum payment plus a significant principal payment close to the $200 payment he was making until he filed for bankruptcy. To the extent he cannot, it was Defendant's burden to demonstrate more exactly his tip income per trip, which is information solely within his control. The court thus concludes that Debtor will have funds available to pay the marital debt from future income over time. *Mickler v. Mickler (In re Mickler)*, 324 B.R. 305, 317 (Bankr. W.D. Ky. 2005)(ability to pay test does not require court to determine whether debtor can repay the obligation in one lump sum).

There being no evidence of the interest rate and term of the loan, the court cannot estimate the time period required for Defendant to repay the debt within a reasonable period of time. *Stoodt*, 302 B.R. at 556("[I]f it is determined that funds are available to pay the debt, it must then be decided whether utilization of such funds would enable the debtor to pay the debt within a reasonable period of time."). As the party with the burden of proof, the inability to determine whether repayment can occur in a reasonable period of time must weigh against Defendant. Nor is there evidence of the parties' ages in the record; although estimating age based on appearance is dangerous, both parties looked to be younger than 40. Nevertheless, given the amount of the debt outstanding, the minimum payment and the projected amount available to Defendant to repay the loan, the court finds that Defendant has failed to meet his burden to prove that he does not have the ability to pay the marital debt at issue within a reasonable time. Therefore, the court concludes that the marital debt incurred by Defendant in connection with the parties' divorce decree is nondischargeable under § 523(a)(15)(A).

### B. 11 U.S.C. § 523(a)(15)(B) - "Balancing the Detriments Test"

Neither § 523(a)(15)(B) nor Sixth Circuit case law provide definitive guidance as to how the court should determine and balance the interests of the parties. But the Bankruptcy Appellate Panel for this Circuit and, in an unpublished opinion, the Sixth Circuit, has endorsed a balancing test as set forth in *In re*

*Smithers*, 194 B.R. 102 (Bankr. W.D. Ky. 1996). *Hart v. Molino (In re Molino)*, 225 B.R. 904, 908-09 (B.A.P. 6th Cir. 1998); *Patterson v. Patterson (In re Patterson)*, 132 F.3d 33 (Table), 1997 WL 745501 (6th Cir. 1997). Under the balancing test, a court should review the financial statuses of the parties and compare their relative standards of living to determine the true benefit of the debtor's possible discharge against any hardship the former spouse and/or children would suffer as a result of a discharge. *Id.* at *3.

> "If, after making this analysis, the debtor's standards of living will be greater than or approximately equal to the creditor's if the debt is not discharged, then the debt should be nondischargeable under the 523(a)(15)(B) test. However, if the debtor's standard of living will fall materially below the creditor's standard of living if the debt is not discharged, then the debt should be discharged."

*Id.* (quoting *Smithers*, 194 B.R. at 111); *see also Hart v. Molino (In re Molino)*, 225 B.R. 904, 909 (B.A.P. 6th Cir. 1998). In *Smithers,* the court listed the following nonexclusive factors to guide balancing the detriments to each party:

> (1) the amount of debt and payment terms;
> (2) all parties' and spouses' current incomes;
> (3) all parties' and spouses' current expenses;
> (4) all parties' and spouses' current assets;
> (5) all parties' and spouses' current liabilities;
> (6) parties' and spouses' health, job training, education, age, and job skills;
> (7) dependents and their ages and special needs;
> (8) changes in financial conditions since divorce;
> (9) amount of debt to be discharged;
> (10) if objecting creditor is eligible for relief under the Code; and
> (11) whether parties have acted in good faith in filing bankruptcy and in litigation of § 523(a)(15).

*Smithers*, 194 B.R. at 111.

A number of these factors have been addressed above. Neither party lives an extravagant lifestyle, and the record shows that their relative financial situations are not materially different, with the exception that Defendant will now be discharged of personal liability for substantial unsecured debt. It can be reasonably asserted as to both parties that in continuing to nurture businesses that they started and love they are not maximizing their earning power. However, if his obligation to Plaintiff is discharged, Defendant will have as discretionary income his tip income which the court finds can be applied to pay the marital debt at issue. By contrast, Plaintiff has no discretionary income. Rather, she uses credit cards to assist her in paying monthly expenses. While the court believes that there is room, with some judicious belt tightening, for Plaintiff to reduce her monthly expenses, her monthly income less business expenses, which amount Defendant did not contest, is only $485, which does not cover her personal monthly expenses. The court

11

questions how Plaintiff is paying, among other things, a $650 boat payment that she took over from Defendant. But there is simply no evidence of record that she has additional income available for such payments. Defendant has thus failed to show that his standard of living will fall materially below that of Plaintiff's if the marital debt is not discharged.

One factor listed in *Smithers* for consideration is the parties' current assets. Defendant does not have any personal property that could be liquidated to help pay the debt in issue. As to Plaintiff, the World Cat boat was the focus of Defendant's somewhat contradictory arguments at trial. On the one hand, counsel's persistent questioning attacked Plaintiff's refusal to reduce the boat asking price to promote a quick sale and eliminate the associated debt on the boat. On the other hand, Defendant argues that Plaintiff now owns the boat and thus any equity in the boat, suggesting that she could satisfy the National City obligation out of the boat equity. Defendant has not proven that to be the case, however. Faced with the unpalatable choice of allowing First Merit Bank to liquidate the boat at a forced sale after Defendant's default, with the accompanying risk of a deficiency for which she alone would be personally liable to the bank given Defendant's discharge, or relieving Defendant of his obligation to her and trying to sell the boat for fair market value, she chose the latter. The court cannot find that Plaintiff's choice was an unreasonable one at the time. Her decision relieved both parties of the high risk of a deficiency at forced sale for which Defendant would otherwise have been liable to Plaintiff under the consent judgment. From an equitable standpoint, Plaintiff's decision has only been of benefit to Defendant as he has now been relieved of all liability associated with the boat. Whether the choice proves financially wise to Plaintiff remains to be seen. However, the relevant issue is whether there is equity in the boat that Plaintiff can now use to pay off the National City debt as well. There is no argument or evidence presented that there would have been any equity if the boat had been allowed to go to a forced distress sale given its unsalable condition. After Defendant's default Plaintiff paid his delinquency on the debt and incurred further debt for repairs necessary to make the boat usable and saleable. She has since continued to make the payments and paid all of the carrying costs. The total debt now owed on the boat is approximately $30,000. [Def. Ex. 4]. The boat has been for sale for more than a year for $45,000, an amount she asserted without contradiction as being necessary to "break even" on the total debt, sales commission and "what she has in in it." Plaintiff's actions have been predicated on her understanding that the value of the boat is $47,900, while Defendant testified that he was aware of similar boats offered for sale through internet listings for between $45,000 and $55,000. However, the boat has only been shown three times and no offers have been received in a year. Given the debt on the boat, her ongoing expenses in maintaining and selling it and the lack of success to date, the evidence does not show there is equity in the World Cat boat available to be applied to the

12

National City debt such that Defendant's obligation to Plaintiff should be discharged based on a weighing of the relative benefits and burdens of the parties.

Another factor listed in *Smithers* for consideration is the non-debtor spouse's eligibility for bankruptcy relief. The legislative history of § 523 indicates that in applying the balancing test under subsection (B), an uncollectible spouse might suffer little detriment from a debtor-spouse's discharge of a hold harmless obligation. The legislative history provides as follows:

> The debt will also be discharged if the benefit to the debtor of discharging it outweighs the harm to the obligee. For example, if a nondebtor spouse would suffer little detriment from the debtor's nonpayment of an obligation required to be paid under a hold harmless agreement (perhaps because it could not be collected from the nondebtor spouse or because the nondebtor spouse could easily pay it) the obligation would be discharged. The benefits of the debtor's discharge should be sacrificed only if there would be substantial detriment to the nondebtor spouse that outweighs the debtor's need for a fresh start.

140 Cong. Rec. H10752-01, H10770 (daily ed. Oct. 4, 1994). While this court, like others, doubts that Congress really intended to encourage more bankruptcy filings to discharge marital debts by adoption of the test in § 523(a)(15)(B), *see Findley,* 245 B.R. at 532-33, the court recognizes that in some circumstances, a bankruptcy filing by the other spouse might make the most overall financial sense for addressing the debts in issue. Even assuming Plaintiff's eligibility for a discharge of her personal liability for various debts, the amount owed on the home equity line of credit is a lien on Plaintiff's home that would pass through bankruptcy unaffected. *See Dewsnup v. Timm*, 502 U.S. 410 (1992); *Talbert v. City Mortgage Services (In re Talbert)*, 344 F.3d 555 (6th Cir. 2003). Thus, Plaintiff's home would remain vulnerable to a foreclosure action if payments are not made on the home equity loan, a point of particular inequity given that Defendant borrowed an additional $5,500 against it after the dissolution without telling her and in violation of the consent judgment. In contrast Defendant rents his home from his parents and will still have a place to live even if his debt to Plaintiff is not discharged; he is not vulnerable to a judgment lien on his place of residence. The court finds Plaintiff's potential exposure to foreclosure to be a substantial detriment to Plaintiff's standard of living that outweighs any benefit of a discharge to Defendant. In any event, the court is unwilling to impose such alternatives where Defendant is able to pay the debt and doing so will not cause his standard of living to notably suffer or fall below that of Plaintiff. Accordingly, the court finds that Defendant has failed to meet his burden under § 523(a)(15)(B). The court, therefore, concludes that the marital debt at issue is nondischargeable under § 523(a)(15)(B).

13

05-03141-maw    Doc 42    FILED 08/27/07    ENTERED 08/27/07 15:46:29    Page 13 of 14

## CONCLUSION

Finding that Plaintiff has sustained her burden and Defendant has failed to sustain his burden under 11 U.S.C. § 523(a)(15), judgment will be entered in Plaintiff's favor and the marital debt will be declared NONDISCHARGEABLE. A separate judgment in accordance with this Memorandum of Decision will be entered by the court.